## JOHN T. DINGLEY vs. CITY OF BOSTON.

**A** statute entitled " to enable " a city " to abate a nuisance, and for the preservation of the public health," authorized the city to " purchase or otherwise take the lands " within a large district, provided for payment to the owners of damages for the taking, and directed the city " to raise the grade of the territory so taken or purchased, with reference to a complete drainage thereof, so as to abate the present nuisance and to preserve the health of the city." The city took the lands under this statute. *Held,* that the fee vested in the city as absolute owners, and that the statute was not unconstitutional, either as an attempt to exercise judicial power, or as authorizing the taking of a greater interest in the land than was necessary.

BILL IN EQUITY filed August 19, 1868, to restrain the defendants from entering a parcel of land alleged to be the property of the plaintiff, and from erecting thereon a building to be used by the defendants as a ward room and a hose house. The answer alleged that the land in question was the property of the defendants.

On June 1, 1867, the legislature passed an act (St. 1867, c. 308) entitled, " An act to enable the city of Boston to abate a nuisance existing therein, and for the preservation of the public health in said city." The first section of this act was as follows :

" The city of Boston may purchase or otherwise take the lands or any of them in said city, with the buildings and other fixtures thereon, situated and lying " within a certain district, known as the Church Street District. " Said city shall, within sixty days from the time when they shall take any of said lands, file in the office of the registry of deeds for the county of Suffolk a description of the lands so taken, as certain as is required in a common conveyance of lands, and a statement that the same are taken pursuant to the provisions of this act; which

Dingley *v.* City of Boston.

**said** description and statement shall be signed by the mayor of said city; and the title to all land so taken shall vest in the city of Boston; and if any party whose land is taken shall agree with the said city upon the damage done to him by the said taking, the same shall be paid to him by the said city forthwith. And it shall be the duty of the city of Boston, forthwith to raise the grade of said territory so taken or purchased, laying out and filling up the same with good materials, with reference to a complete drainage thereof, so as to abate the present nuisance and to preserve the health of the city, and in nowise to affect injuriously the lands of the Commonwealth or its grantees in the Back Bay, or the system of drainage therein."

The second section was in these words : " Any person entitled to any estate in any part of the land so taken, may at any time within one year from the time when the same shall be taken, as well in his own behalf as in behalf of all other persons having estates in the land so taken, file a bill in equity in the supreme judicial court, in the county of Suffolk, setting forth the taking of the complainant's land, and the condition of the same in respect to its capacity for drainage, and whether the complainant claims any and what damages against the city of Boston, or the Boston Water Power Company, or any other corporation or person, by reason of any and what wrongful act or omission by their causing a diminution in the value of his land at the time of said taking, and praying an assessment of damages against such parties. And upon the filing of such a bill, the said court shall cause notice of the pendency of said bill to be given to the parties named therein as defendants, according to the course of courts of equity, and also public notice thereof, to all persons in whose behalf such bill shall be filed, to appear and become parties thereto, if they shall think fit to do so. Said court shall prescribe how such public notice shall be given, and what length of time shall be allowed for appearing and becoming a party to such suit. Any party failing so to appear and become a party within the time prescribed by the court, shall be forever barred from recovering any damages on account of such taking. Each person so appearing, and becoming a party, shall

file a written description of the land in which he claims an estate, together with a plan thereof, so as clearly to distinguish the same from all other lands, and shall also declare what estate he claims therein. If he claims that the value of said lands at the time of taking the same was lessened by any unlawful act or omission of the city of Boston, or the Boston Water Company or any other corporation or person, so that the value of the land in its condition when taken would not be a just compensation for all the estate and rights of the party in and in reference to the same, such party shall also state what such injury is, and how and by whom the same had been, or is, caused, and what right or title of the party is violated, and what amount of damages in gross is claimed by him, as compensation therefor, from each of the parties defendant."

Other sections of the act provided for the appointment of commissioners to hear the parties under this bill, and assess the value of the land taken; for the framing of issues, and their trial by jury; for a decree and execution for damages, and also for compensation for injury to the owners of the land taken, by any unlawful acts or omissions of the Commonwealth or its agents or officers, or of the city or the Boston Water Power Company, which might have diminished the value of the land at the time of taking it.

By an additional act of the same date, St. 1867, *c.* 353, the city was " authorized to lay railway tracks through any street or streets of said city, and to maintain them so long as it may be necessary to enable them to transport earth and other material to fill up the Church Street District, so called, and to abate the nuisance existing therein, under the provisions " of the above act.

Pursuant to the provisions of the act, the board of aldermen, by an order signed by the mayor May 9, 1868, declared that the city " has taken and by these presents does take the following described parcels of land." These parcels of land formed the district described in the first section of St. 1867, *c.* 308, and included the lot of land in question. This lot, at the time of the passage of this order, was owned in fee by the plaintiff.

On May 22, 1868, the city council passed an order appointing commissioners to supervise the work to be done in the Church Street District, and authorizing them " to contract for filling all the streets and places to the grade of at least eighteen feet above mean low water; and the cellars, back-yards and vacant lots to the grade of at least twelve feet above mean low water; also, for raising and underpinning such of the houses and other buildings on said territory as they shall deem necessary to the preservation of the public health." Another order of the city council, passed at the same time, provided that when the lands within the district had been taken by the city, under the provisions of St. 1867, *c.* 308, " the mayor may enter into a contract in behalf of the city of Boston, to convey the estates on said district, or such portions as are not required for widening streets or other purposes, back to the original owners, after the territory and buildings have been raised as provided in the foregoing order; *provided, however,* that the persons who owned the estates at the time of their taking by the city will agree in writing, to take a release of their respective estates, and to clear the basements of their buildings before the raising, and make all necessary repairs upon the buildings at their own expense after the raising and underpinning, and make no claim upon the city for any damages on account of the work performed by the city."

In July 1868 the city council passed an order to erect a building to be used for a ward room and a hose house, on a certain described " lot of land belonging to the city." This lot was the land which had belonged to the plaintiff, and this bill was brought to restrain the execution of the order.

The above facts appeared at the hearing before *Gray,* J., who reported the case for the determination of the whole court.

*G. Putnam, Jr.,* for the plaintiff. Private property can be taken against the owner's will, by legislative authority, only for a public purpose expressed in the act authorizing the taking, and to the extent demanded by that purpose as expressed. Whether the excess is in taking more land than is required, or is in taking a greater estate than the expressed purpose calls for, in either

case the excessive taking is void. *Matter of Albany Street,* 11 Wend. 149. *Embury* v. *Conner,* 3 Comst. 511. *Varick* v. *Smith* 5 Paige, 137, 146. *Matter of John & Cherry Streets,* 19 Wend 675, 677. *Jessup* v. *Louckes,* 55 Penn. State, 350, 361. 2 Kent Com. 340. The province of the legislature is only to declare the purpose of the taking; it is a judicial question what estate is taken; it is only by analogy that the public right is likened to an easement, or to a freehold or fee. Thus, where lands have been taken for a highway, a turnpike, a canal, a school-house, the courts, in determining the extent to which the owner's title has been divested in favor of the public or of the corporation to which the right of eminent domain has been delegated, have been governed wholly by the practical requirements of the particular public use in question, without regard to any language in the act of taking purporting to describe the nature of the interest taken. *Brainard* v. *Clapp,* 10 Cush. 6. *Hooker* v. *Utica & Minden Turnpike Road Co.* 12 Wend. 371. *People* v. *White,* 11 Barb. 26, 28. *People* v. *Kerr,* 27 N. Y. 188, 196, 211, 212. *Adams* v. *Emerson,* 6 Pick. 57. *Tucker* v. *Tower,* 9 Pick. 109. *School District in Norton* v. *Copeland,* 2 Gray, 414, 418. 1 Redfield on Railw. (3d ed.) 247, 251, 254, and cases cited.

The statute now in question provides that the city " may purchase or otherwise take " the lands, that " the title to all land so taken shall vest in the city," and that the city " shall forthwith raise the grade of the territory with reference to a complete drainage thereof, so as to abate the present nuisance and to preserve the health of the city." Upon the principles contained in the authorities cited, the title of the city must be held to be only that which is necessary for the purpose of abating the nuisance in the manner prescribed, that is, by raising the land. What is necessary for that purpose is shown by the votes of the city providing for the raising and reconveyance of the land. If the defendants may hold the land after it is raised, and sell or use it as the private property of the city, then land may be taken, and in the present case is taken, from one and given to another merely because the legislature thinks that the latter will make a better use of it. Under the St. of 1867, *c.* 306, authorizing the

city to take land for a court-house, the city may take land for a hospital or a jail, or they may take one man's land against his will and sell it to another. No law has ever authorized the city to take land, against the owner's will, for a ward room and hose house.

There must always be a possibility of reverter left in the owner of land taken for public use. Whether further compensation is necessary where a new public use has been imposed upon land which has once been taken for such a public use as is, according to ordinary experience, perpetual, is a question which has been decided differently by different courts. *Imlay* v. *Union Branch Railroad Co.* 26 Conn. 249, 255. *Williams* v. *New York Central Railroad*, 16 N. Y. 97. *Presbyterian Society* v. *Auburn & Rochester Railroad Co.* 3 Hill, 567. *Chase* v. *Sutton Manufacturing Co.* 4 Cush. 152. But where further compensation is denied, the new use is a public use, and compensation is denied because the damage from the additional incumbrance is deemed insignificant, the first use being perpetual. The legislature might undoubtedly authorize the city to take the plaintiff's land for a hose house, but it is not pretended that such an authority has been given. The city claim to have become the absolute private owners of the land, free from all public uses. A title free from public use cannot be obtained by eminent domain.

The landowner's remaining interest cannot be given to the city as "remuneration" for their services. Private property can be taken to remunerate private services only in the form of taxes involuntarily, or of tolls voluntarily contributed.

The land cannot be treated as changed by the filling put on it, so that the original owner's title is lost. The general law of real estate is that all accessions follow the ownership of the land instead of drawing it to themselves, and that general law cannot be changed for a particular case. Declaration of Rights, art. 10. *Picquet, appellant,* 5 Pick. 65.

There is no analogy between the taking of land under the right of eminent domain, and the seizure or destruction of perishable property in time of war. The latter is an act of martial

law, and is simply an injury without remedy. The true analogy is to land taken for earthworks, where, after the battle is over and the works abandoned, the rights of the original proprietor revive.

The court will construe an act so as to make its provisions constitutional, even at the expense of much greater violence to its language than is necessary here. *Embury* v. *Conner,* 3 Comst. 511. *Bloodgood* v. *Mohawk & Hudson Railroad,* 18 Wend. 1, 19. *Newland* v. *Marsh,* 19 Ill. 376, 384. *Dow* v. *Norris,* 4 N. H. 16.

*S. Bartlett,* (*W. P. Walley* with him,) by leave of the court, for parties in like interest with the plaintiff. This act rests either on the power of the legislature to make all manner of wholesome laws not repugnant to the Constitution, or on its power to exercise the right of eminent domain.

1. The legislative authority to provide for the abatement of nuisances is not an exercise of the right of eminent domain. *Fisher* v. *McGirr,* 1 Gray, 1, 41. *Commonwealth* v. *Tewksbury,* 11 Met. 55.

The object of this act is professedly the abatement of a declared public nuisance. It asserts that a public nuisance exists, describes its limits, and authorizes the city to take all lands within those limits. It vests in the city the absolute fee simple of lands thus taken, and provides that the city shall forthwith raise the grade of such lands " with reference to a complete drainage thereof, so as to abate the present nuisance and to preserve the health of the city."

The authority conferred rests on the assumed power of the legislature to declare the existence of a public nuisance. But the legislature has not that power, and its exercise violates the Declaration of Rights, art. 12, 30. It is an attempt of the legislature to exercise judicial power, and to deprive the plaintiff of his estate without the judgment of his peers or the law of the land. The statute enacts that a nuisance exists on the plaintiff's land. But to permit a nuisance to exist is to commit an offence, and subjects the offender to penalties. Whether or not nuisance exists is a judicial question. This court has held that the tribunals which first determine it exercise a quasi-judicia.

function; and, without an ultimate opportunity to try the ques-- tion, with notice and in the usual manner, no man can be re- stricted in the use of his property, much less deprived of it. *Belcher* v. *Farrar*, 8 Allen, 325. *Salem* v. *Eastern Railroad Co.* 98 Mass. 431.

2. This statute cannot be supported as an exercise of the right of eminent domain. The purpose of the statute and the means to effect that purpose are exactly defined and prescribed; but the city is authorized to take a larger estate from the citizen than, on the face of the statute, the " public exigencies " require. No other or higher estate can be taken from the citizen than is necessary for the public exigency. *Matter of Albany Street*, 11 Wend. 149. *Matter of John & Cherry Streets*, 19 Wend. 659. *Varick* v. *Smith*, 5 Paige, 137, 146, 147. *Embury* v. *Conner*, 3 Comst. 511. When there is occasion for the use of the right of eminent domain, the judiciary must have the power to declare an act unconstitutional which authorizes the use of the right to a greater extent than the public exigencies require ; and the judi- ciary must have the power to determine whether a declaration in a statute that a public exigency requires the exercise of the right of eminent domain is untrue and delusive; otherwise there are no constitutional, fundamental restrictions on legislative power. A statute which took the land of A. and gave it to B. would be unconstitutional; and would not be made constitu- tional by a declaration that a public exigency required this to be done. A public exigency may require that a street be laid out through certain lands, but cannot require that lands outside of the proposed street be taken for that purpose. The abate- ment of this nuisance, which is to be done " forthwith," cannot require the taking of the fee of this large territory. The votes of the city council show that the city claim that they will hold the whole area as vendible property after they have accomplished the purposes for which alone the statute could be passed. After the nuisance is abated, the city will hold this territory for no public purpose, but for a private purpose; the public purpose will have been accomplished. The result of this statute will then be the same as if the legislature first authorized the taking

of a limited estate in this territory for a public purpose, and subsequently authorized the taking of an unlimited, a fee simple estate in this territory for a private purpose.

As a test of the soundness of the above view, it is submitted whether a general law for the abatement of nuisances, which should (do what was not done by this act) submit the question of the existence of the nuisance to a judicial tribunal, and, upon its being found to exist, should authorize the taking in fee simple absolute of all the lands, or a whole lot, on a part of which the nuisance existed, could be supported.

*J. P. Healy & C. H. Hill*, for the defendants. 1. By the St. of 1867, *c.* 308, and the proceedings of the city authorities under it, the city acquired an absolute title to all the lands within the district described. This is shown by the provisions that the city " may purchase or otherwise take " the lands; that the taking shall be recorded in the registry of deeds; " that the title to all the land so taken shall vest in the city of Boston; " and that " any person entitled to any estate in the land so taken " shall be paid " the present value " thereof and whatever damage may have been incurred by reason of the bad drainage of the district and the existence of the nuisance thereon. The word " title," at common law, or at least by the meaning it has acquired in Massachusetts, imports a fee in contradistinction to any mere easement. See Co. Lit. 345 *b ;* 2 Bl. Com. 195; and the use of the word in *Commonwealth* v. *Alger*, 7 Cush. 53, 70; *Commonwealth* v. *Roxbury*, 9 Gray, 451, 481–483, 499, 500, 518; *Boston* v. *Richardson*, 13 Allen, 146, 152, *et seq.* Besides, the words " purchase or otherwise take " would, without any addition, give the city an interest in the land sufficient for any usufruct therein or any temporary occupation or use thereof; and if this was all the interest which they acquired under the act, the remaining words would be meaningless; but it is a fundamental rule of construction that full effect is to be given to all the words of a statute, if possible.

But another view of the statute is conclusive upon this question. If the city only acquired an estate in the nature of an easement in the territory, the land would revert to the owners

after they had been fully compensated for it, and after its value had been greatly enhanced by the raising of the grade and the abatement of the nuisance; and the city would receive no remu neration for its vast outlay. It is obvious from these extraordi nary results that such was not the intention of the legislature. While courts will always put such a construction upon a stat- ute as will sustain it, and are unwilling to declare an act uncon- stitutional if by any reasonable construction it can be made constitutional, this will not be done where it would be a plain violation of the intention of the legislature. See *Warren* v. *Mayor, &c. of Charlestown,* 2 Gray, 84, 99.

2. The purpose of the act is " to enable the city of Boston to abate a nuisance existing therein, and for the preservation of the public health in said city." It cannot be questioned that this is a public use. *Springfield* v. *Connecticut River Railroad Co.* 4 Cush. 63, 71. Whether the exigency exists which de- mands that private property shall be taken for a public pur- pose is a matter of which the legislature is the sole judge, and the enactment of a statute taking it is an adjudication of the existence of the necessity. 2 Kent Com. (6th ed.) 340. *Wel- lington, petitioner,* 16 Pick. 87, 101. *Bloodgood* v. *Mohawk & Hudson Railroad Co.* 18 Wend. 1, 13 *et seq.* and cases cited. It is also within the exclusive province of the legislature to decide how much property is needed for the public use. The court will not revise its decision. *Hingham & Quincy Bridge & Turnpike Co.* v. *County of Norfolk,* 6 Allen, 353, 360. The owner having therefore been divested for a public purpose of all interest in his land, its ultimate appropriation to other uses than the one for which it was originally taken can be justified on two grounds: 1st, Because the right to do so is one necessarily inherent to an absolute estate in fee, and is exactly the same right which the government would have at the end of a war to sell what might remain of personal property taken for military purposes; for real property is no more sacred than personal. In both cases, the Constitution requires only that the owner shall be fully compen- sated. 2d, Because, if the legislature adjudicate that, in order to effectuate a great public purpose, it is necessary to divest all ex-

isting titles to land and vest it in others, and to grant them such a title as will enable them, after accomplishing the purpose, and improving the land, to sell it again, and thus in part compensate themselves for the outlay they have incurred, such use of the land is justifiable as being precisely analogous to the profit which railroad corporations are allowed to make out of land taken by the law of eminent domain. *Chase* v. *Sutton Manufacturing Co.* 4 Cush. 152, 171. *Boston & Lowell Railroad Co.* v *Salem & Lowell Railroad Co.* 2 Gray, 1, 35. *Heyward* v. *Mayor, &c. of New York,* 8 Barb. 486, and 3 Selden, 314. *Rexford* v. *Knight,* 15 Barb. 627, and 1 Kernan, 308. *De Varaigne* v. *Fox,* 2 Blatchf. C. C. 95. *Tide Water Co.* v. *Coster,* 3 C. E. Green, 518. *Raleigh & Gaston Railroad Co.* v. *Davis,* 2 Dev. & Bat. 451, 467, *et seq.* Cooley on Const. Limit. 558, 559. 19 Law Reporter, 249, 256. Unless there existed some such power as this, almost all great public works would not be constructed at all, or else would only be constructed at a burdensome expense to the public in the form of taxation.

CHAPMAN, C. J. The plaintiff alleges, and the parties agree, that the acts complained of in the bill purported to be done under the statute of June 1, 1867, entitled "an act to enable the city of Boston to abate a nuisance existing therein, and for the preservation of the public health in said city."

The first section describes a large tract of land situated in the city, and provides that the city "may purchase or otherwise take" the said lands, or any of them, with the buildings and other fixtures thereon; that the city shall, within sixty days from the time they shall take any of said lands, file in the office of the registry of deeds for the county of Suffolk a description of the lands so taken, as certain as is required in a common conveyance of lands, and a statement that the same are taken pursuant to the provisions of the act, which description and statement shall be signed by the mayor of said city; and the title to all land so taken shall vest in the city of Boston.

The question has been presented whether this language imports a title in fee simple. We think the words will bear no other fair and reasonable construction, and that the legislature intended that such a title should be vested in the city.

The act then provides that the city shall pay to the owner the damage done to him by the taking; and if the parties cannot agree upon the amount, it provides for ascertaining the damages by a bill in equity, giving to the owner the right of trial by jury.

It also provides for compensation to the owners of the land for any damage that may be occasioned to them by any act or omission of the Commonwealth, or its agents, or officers, or by the city of Boston, or by the Boston Water Power Company, by any acts or omissions that shall have diminished the value of the land at the time of taking it.

It provides that "it shall be the duty of the city of Boston, forthwith to raise the grade of said territory so taken or purchased, laying out and filling up the same with good materials, with reference to a complete drainage thereof, so as to abate the present nuisance and to preserve the health of the city, and in nowise to affect injuriously the lands of the Commonwealth or its grantees in the Back Bay, or the system of drainage therein."

By the proceedings of the city government, which are referred to by the parties, the ground of this legislation more fully appears. The territory is known as the Church Street District, and contains an area of about sixteen acres. The sewers first established there had an outlet into the empty basin in the Back Bay; and as the water in the basin did not rise more than two or three feet above low water, no difficulty was experienced in the drainage, although the grade of a large portion of the territory, extending as far as Dover Street, was not more than five or six feet above mean low water. As the population increased in the southerly part of the city, a large quantity of sewage matter which was discharged into the empty basin created a nuisance dangerous to the public health.

It was found necessary, therefore, to devise a system of drainage which would carry a portion, at least, of the sewage into deep water.

But, under the authority of the Commonwealth, the Back Bay has been filled up to a level considerably higher than that of the sea at high tide, and thus the artificial reservoir which

formerly existed with a surface very little above that of the sea at low tide, and into which this low tract of land could always be drained, was destroyed, and the drainage must now be completely subject to the changes of level created by the tides. The city authorities say that the only remedy was to raise the grade of the territory, and that the necessity for such a course has been clearly foreseen for a number of years. While we can conceive of other methods of drainage, it is obvious that they must be very expensive and imperfect, and that the legislature regarded the raising of the surface of the land as reasonably necessary in order to abate an extensive nuisance which endangered the health of the city. No question is made by the parties in regard to the existence of the nuisance occasioned by the facts above stated, or in regard to its dangerous character, or as to the propriety or efficacy of the remedy by raising the grade of the territory. No suggestion is made that either the legislature or the city government has been influenced by any improper motives.

But the plaintiff contends that the provisions of the act, or at least a portion of them, are unconstitutional.

1. It is alleged that the legislature has assumed the power to declare the existence of a public nuisance on the land of the plaintiff, and that this is an exercise of a judicial power, because it charges him with an offence, and decides the question without giving him an opportunity to be heard, and then proceeds to deprive him of his land.

It is obvious that this view is not quite correct. The law does not regard him as an offender in any sense; for it gives him a right to compensation, not only for all the damage occasioned by the taking of his land, but for its deterioration in value before the taking, whether by the acts or omissions of the agents of the Commonwealth, or of the city, or of the Boston Water Power Company. It regards him as an innocent person whose land is to be taken on the ground of public necessity, in order to protect the health of the city.

Upon the facts stated it is apparent that no indictment would lie against him, notwithstanding the nuisance; for it has been

created by the acts of others which were beyond his control, and it is not in his power to remove it. The action of all the landholders in this large territory could not abate it, for it appears that there are public streets upon it; and, if they could remove it, there is no ground for requiring them to incur the expense. The plan adopted was to raise the grade to the height of eighteen feet above mean low water; the expense of which must be very great, and practically beyond the power of mere individual enterprise to accomplish. An additional act of the legislature authorized the city to lay railroad tracks through any of the streets of the city, and to maintain them so long as it might be necessary to enable them to transport earth and other material to fill up the territory and abate the nuisance. This shows that the work was regarded by the legislature as a great public enterprise for a highly important object, and one that needed to be prosecuted by legislative authority.

It is difficult to see how a judicial tribunal could have dealt with this matter under any known forms of proceeding; or how it could have adjudicated upon the extent of the nuisance; or have applied a remedy. Its procedure is not adapted to affairs of this general character, where there is no controversy between individual parties, nor any offence against the Commonwealth. But where the sanitary condition of a large city requires an interference with the real estate of a great number of persons, making expensive and essential changes in the condition and character of the land, a case is presented within that clause of the Constitution which confers authority upon the legislature to make " all manner of wholesome and reasonable laws so as the same be not repugnant or contrary to this Constitution." Part 2, *c.* 1, § 1, art. 4. In *Hingham & Quincy Bridge & Turnpike Co.* v. *County of Norfolk,* 6 Allen, 353, Bigelow, C. J., says one of the main purposes of this clause was to vest in the legislature a superintending and controlling authority, under and by virtue of which it might enact all laws not repugnant to the Constitution of a police and municipal nature, and necessary to the due regulation of the internal affairs of the Commonwealth. In that case it was held to authorize a legislative act, taking, for

the purpose of laying out a highway, a turnpike and bridge and also the toll houses and lands under and around them which the corporation had obtained by purchase. It was further held that this was not the exercise of a judicial power.

Proceedings to ascertain and recover damages for property thus taken are properly referred to the judiciary. So, also, when land and other property of a turnpike or bridge corporation is taken by the legislature for the purpose of establishing a public highway, the legislature determines what property shall be taken, but may properly refer to the judiciary the duty of appointing commissioners as officers of the court to hear the parties inter-ested and apportion among them the expense of the proceeding, and of rendering judgment on the report of the commissioners, and issuing process to enforce their judgment. *Hingham & Quincy Bridge & Turnpike Co.* v. *County of Norfolk,* 6 Allen, 353. *Salem Turnpike & Chelsea Bridge Co.* v. *County of Essex, ante,* 282.

In *Varick* v. *Smith,* 5 Paige, 137, it is said that the legislature is the sole judge as to the expediency of making police regu-lations interfering with the natural rights of citizens which are not prohibited by the Constitution, and also as to the expedi-ency of exercising the right of eminent domain for the purpose of making public improvements, either for the benefit of the in-habitants of the state or of any particular portion thereof.

The court are of opinion that the objection stated above is not valid.

2. It is further objected that, even if it be conceded that a proper case exists for legislative action, yet the legislature has attempted to authorize a method of proceeding that violates the rights of the plaintiff.

The act provides that the city government may first take the land, and thereby transfer to the city a title in fee simple with-out the consent of the owners. It is contended that, as the only object of the act is to abate a nuisance, the act ought only to have granted the power to occupy the land temporarily until the object of the act should be effected, and it should then be re-stored to the owners, with a provision that the benefit done to

the land should be applied in offset to the damages. It is true that the raising of the grade does not require an occupation of the land for a great length of time. ˚When this work is completed, the nuisance will be abated, and the land will be in a condition to be occupied by private persons. But its condition will be greatly changed ; almost as much so as raising flats into upland. The former surface will be deeply buried under the earth that will have been brought upon it, and the changed condition is to be perpetual. If the old property is restored, the new property which has been annexed to it must go with it. This would be very unjust to the city, who have been compelled to incur the great expense of destroying the nuisance, unless the owner were required to make a reasonable compensation, which might be far beyond the amount of the damages to which he would be entitled.

It would be difficult to adjust the matter ; and in many cases it might operate harshly upon the owner to compel him to take and pay for the improvements. On the whole, therefore, the plan of compelling the city to take the land in fee simple, and the owner to part with his whole title for a just compensation, would seem to be the most simple and equitable that could be adopted ; unless there is some objection on the ground that a fee simple is more sacred than an estate for life or years, or than an easement of greater or less duration. We can see no ground for regarding one of these titles as more sacred than another, or for regarding land as more sacred than personal property. In *Chase* v. *Sutton Manufacturing Co.* 4 Cush. 152, a right granted to a canal company was held to remain after the canal ceased to exist, and to be transferable to other parties, to be used as fully as if it were held in fee simple. In *Heyward* v. *Mayor, &c. of New York*, 3 Selden, 314, land was taken in fee simple by the defendants under an act of the legislature for the purpose of enlarging a poor-house, and it was held that the act was constitutional. In *Rexford* v. *Knight*, 1 Kernan, 308, a similar doctrine was held in regard to land taken in fee simple for the Erie Canal. After the canal was changed to a new locality it was held that no title reverted to the original owner. In *United States*

v. *Harris*, 1 Sumner, 21, Judge Story treats a question of this character as depending on the construction of the legislative act rather than upon the constitutional power of the legislature. See also *Harris* v. *Elliott*, 10 Pet. 25.

Whether land be taken under the clause authorizing the making of wholesome and reasonable laws, or by virtue of the clause authorizing the appropriation of private property to public uses, it must in either case be left to the legislature to decide what quantity of estate ought to be taken in order to accomplish its purpose, and do the most complete justice to all parties. In the taking of other property no one would doubt that an absolute title might be acquired. If, for example, in time of war the government were to take timber for a ship of war, or horses for the army, and pay for them, no one would suppose that the owner could reclaim his property after the war was over; or that the government, having ceased to use it, could not sell it, and give a good title to it.

In taking land for highways, the legislature has not deemed it necessary to take more than an easement; but the easement is usually perpetual; and an absolute title to timber and trees is taken if they are not removed within a prescribed time. The Constitution provides for the protection of all private property, and it provides that, when the public exigencies require that the property of any individual shall be appropriated to public uses, he shall receive a reasonable compensation therefor. But it leaves the legislature, without any restriction, express or implied, to decide in each case as it arises, what constitutes such exigency; and, if land is to be taken, what estate in it shall pass. The legislature may also direct the transfer to be made to a corporation. Turnpikes, canals and railroads furnish examples of such grants. Aqueducts are often constructed by virtue of legislative acts which authorize towns or cities to take private property for the purpose. It is implied in the constitutional provisions referred to, that private property shall not be taken except for a public use. But there are no titles to property in the Commonwealth that are paramount to the Constitution and laws. On the contrary all property, real, as well as

personal, is held under the government, and subject to all its reasonable needs for public exigencies.

The court are of opinion that none of the legal rights of the plaintiff are infringed by the act in question, or by the proceedings of the city under it.  *Bill dismissed.*