HENRY L. HIGGINSON & others *vs.* TREASURER AND SCHOOL
HOUSE COMMISSIONERS OF BOSTON.

Suffolk.    September 11, 1912. — October 15, 1912.

Present: RUGG, C. J., MORTON, HAMMOND, BRALEY, & DECOURCY, JJ.

*Parks and Parkways.   Boston.   Back Bay Fens.   Statute,* Construction.
*Equity Jurisdiction,* To restrain unlawful expenditure by municipality.

The park called the Back Bay Fens, which was acquired in fee by the city of Boston
for the use of the public under the authority given by St. 1875, c. 185, is held
by that city as an agency of government and not as a private corporation, and
the Legislature has the power to appropriate it or any part of it to another
public use without the consent of the city.

Land appropriated to a public use cannot be diverted to another inconsistent
public use without plain and explicit legislation to that end.   By RUGG, C. J.

St. 1911, c. 540, which authorizes the park commissioners of Boston, upon the re-
quest of the school house commissioners with the approval of the school com-
mittee, to permit the erection of a building for the High School of Commerce
within the limits of the Back Bay Fens, does not authorize permission to erect
in that park a building to be used not only for the High School of Commerce
but also for the administrative offices of the school committee and of the
school house commissioners as contemplated by St. 1909, c. 446.

Upon a bill in equity under R. L. c. 25, § 100, by taxable inhabitants of a city to
restrain the alleged unlawful expenditure of money for the erection of a school
building in a public park, the question, whether the constitutional rights of the
owners of property on which a betterment tax was assessed for the laying out
and construction of the park would be infringed by the construction of the pro-
posed building, cannot be raised, the persons whose rights thus would be affected
not being parties to the suit.

BILL IN EQUITY, filed in the Supreme Judicial Court on July
30, 1912, by twelve taxable inhabitants of the city of Boston
against the treasurer and the school house commissioners of that
city, to restrain the raising or expenditure of money or the in-
curring of obligations for the purpose of constructing in the park
known as the Back Bay Fens a building for the High School of
Commerce or for that school and the administrative offices of
the school committee and the board of school house commissioners.

The answer of the defendant school house commissioners
alleged that on January 2, 1912, the board of park commissioners
of the city of Boston under St. 1911, c. 540, approved the plans
for the building in question to be erected within the limits of the

Back Bay Fens upon a site selected by the defendant school house commissioners with the approval of the school committee.

The case was heard by *Loring,* J., who reserved and reported it for determination by the full court. The material facts are stated in the opinion.

The case was submitted on briefs.

*N. Matthews & P. Nichols,* for the plaintiffs.

*G. A. Flynn,* for the defendants.

RUGG, C. J. This is a bill in equity by taxpayers of Boston to restrain certain officers of that city from erecting a building upon a public park known as the Back Bay Fens. This park was established in 1879 under the authority of St. 1875, c. 185. The city of Boston acquired the fee to the lands included within the park, and has expended large sums of money in locating, laying out, constructing and improving it. By St. 1911, c. 540, the park commissioners of Boston (the public board having control of the Back Bay Fens and other parks) were authorized, upon request of the school house commissioners of the city, with the approval of the school committee, to permit the erection of a building for the High School of Commerce within the limits of the Back Bay Fens.

The first question is whether the Legislature has the power to authorize the construction of such a building in a public park of Boston without the consent of the city expressed either by its voters or its city council, and without the exercise of the power of eminent domain. This necessitates an inquiry into the nature and quality of the right and title of a municipality in land acquired by it for park purposes. The park in question was taken by Boston in the exercise of the power of eminent domain. Therefore, no question arises respecting compliance with the terms of a gift, devise, grant or bequest, and considerations which would be decisive under such circumstances are aside from this discussion. *Howe* v. *Lowell,* 171 Mass. 575. See *Cary Library* v. *Bliss,* 151 Mass. 364, 375; *Riverside* v. *MacLain,* 210 Ill. 308; *Lamar Co.* v. *Clements,* 49 Texas, 347. *Cummings* v. *St. Louis,* 90 Mo. 259. *San Francisco* v. *Itsell,* 80 Cal. 57. *Fessler* v. *Union,* 1 Rob. (N. J.) 14. This is the simple instance of a park acquired by the expenditure of public moneys raised by taxation.

Cities and towns are territorial subdivisions of the State created as public corporations for convenience in the administration of

government.   They exercise only the powers which have been conferred by express enactment of the Legislature or by necessary implication from undoubted prerogatives vested in them. They have a twofold character, the one governmental and the other private.   In the one they execute the functions and possess the attributes of sovereignty which have been delegated by the legislative department of government; in the other they are clothed with the capacities of a private corporation, and may claim its rights and immunities, and are subject to its liabilities. *Neff* v. *Wellesley*, 148 Mass. 487.   *Davies* v. *Boston*, 190 Mass. 194.   *Haley* v. *Boston*, 191 Mass. 291.   *Kies* v. *Lowrey*, 199 U. S. 233.   *Hunter* v. *Pittsburgh*, 207 U. S. 161, 178.   *Vilas* v. *Manila*, 220 U. S. 345, 356.

The property of which a city or town has acquired absolute ownership as an agency of the State, and which it holds strictly for public uses, is subject to legislative control.   It may be transferred to some other agency of government charged with the same duties, or it may be devoted to other public purposes.   This power always has been exercised in this Commonwealth upon some principles of public justice to the communities affected. *Rawson* v. *Spencer*, 113 Mass. 40.   *Agawam* v. *Hampden*, 130 Mass. 528.   *Springfield* v. *Springfield Street Railway*, 182 Mass. 41.   *Worcester* v. *Worcester Consolidated Street Railway*, 182 Mass. 49; *S. C.* 196 U. S. 539.   The property which a municipality holds in its private capacity is not subject to the unrestricted authority of the Legislature, and no person can deprive it of such property rights against its will, except by the exercise of eminent domain with payment of full compensation.   *Mount Hope Cemetery* v. *Boston*, 158 Mass. 509.   *Ware* v. *Fitchburg*, 200 Mass. 61, 68. *Codman* v. *Crocker*, 203 Mass. 146, 150.

The precise point is whether the city of Boston in establishing this park acted as an arm of the Commonwealth or as a private corporation in its proprietary capacity.   This point has never been decided in this Commonwealth.   In several cases, however, the character of land devoted to use as a park or common has been before the court, and expressions indicative of its view have been used.   It was said in *Holt* v. *Somerville*, 127 Mass. 408, 411, respecting park land taken under a statute similar to that we are now considering: "The legal title by such purchase

became vested in the city, not for its own use in a corporate capacity, but in perpetual trust for the use of all who at any time might enjoy the benefit of a public park." In *Clark* v. *Waltham,* 128 Mass. 567, 569, it was decided that the city held "the park, not for its own profit or emolument, but for the direct and immediate use of the public. If it can be said that there is any duty in the town to construct paths over it, or to keep such paths in repair, it is a corporate duty, imposed upon it as the representative and agent of the public and for the public benefit." It was held in *Wrentham* v. *Norfolk,* 114 Mass. 555, 562, that the title to an ancient common or training field laid out by the original proprietors was in the town not for its own use in a corporate capacity, but for the benefit not only of inhabitants of the town but of all "who might have occasion to use it." In *Oliver* v. *Worcester,* 102 Mass. 489, 495, it was said respecting a similar common: "The whole common is in one sense dedicated to the public use, as a place of public resort and recreation, over any part of which persons may pass freely, unless restricted for some public and sufficient reason." In *Abbott* v. *Cottage City,* 143 Mass. 521, 525, respecting a park, it was asserted by Mr. Justice Holmes apparently as a proposition too plain to require further discussion, that "the use is in the public at large." In *Attorney General* v. *Abbott,* 154 Mass. 323, while holding that a park could be established by dedication, it was said that the easement was "not in the town, but it is in the public at large." See also *Attorney General* v. *Vineyard Grove Co.* 181 Mass. 507; *Wellington, petitioner,* 16 Pick. 87. In *Commonwealth* v. *Abrahams,* 156 Mass. 57, where rights in Franklin Park, acquired by Boston under the same statute as the Back Bay Fens, were considered, it was said, "The parks of Boston are designed for the use of the public generally." This language was quoted with approval in *Commonwealth* v. *Crowninshield,* 187 Mass. 221, 224.

Several cases have arisen involving the character of the public interest in Boston Common which was dedicated by its owners in 1634 "for the common use of the inhabitants of Boston as a training field and cow pasture." In *Steele* v. *Boston,* 128 Mass. 583, it was said that "The city holds the common for the public benefit, and not for its emolument, or as a source of revenue, and . . . maintains the common solely for the benefit of the public.

If there is any legal duty to keep the paths in a safe condition, it is solely a public duty." In *Lincoln* v. *Boston*, 148 Mass. 578, 580, it was said as to the Common: "The use of it is dedicated to and belongs to the public. . . . The city cannot let or sell the Common. . . . The ordinance set out in the declaration is not the exercise of an owner's authority over his property, but is a police regulation of the use of a public place by the public." In *Commonwealth* v. *Davis*, 162 Mass. 510, Mr. Justice Holmes said: "There is no evidence before us to show that the power of the Legislature over the Common is less than its power over any other park dedicated to the use of the public, or over public streets the legal title to which is in a city or town. . . . As representative of the public, it may and does exercise control over the use which the public may make of such places." In *Codman* v. *Crocker*, 203 Mass. 146, at 152, 153, it was said by Chief Justice Knowlton "In different decisions the city has been treated as holding the legal title [to the Common]; but it holds it only as it is an agency of government representing the interests of the public. It has no rights of a private owner, apart from its holding as a representative of the government. As an agency of the government representing the people, it is subject to the control of the Legislature, which may abolish it and establish another agency in its place, or may deprive it of its power to represent the public, or may transfer a part or all of its governmental authority to another creation. . . . We are of opinion that the title of the city is held only in its municipal capacity as an agency of the government for the benefit of the public, and that the power of the Legislature to represent this interest is supreme."

These decisions touching Boston Common, although made respecting land dedicated instead of taken by eminent domain, nevertheless concern the character and nature of the purpose to which common or park land is devoted. A dedication of land by its private owner "for the common use of the inhabitants of Boston" is as strongly restricted to the municipality as is that taken for its park purposes under St. 1875, c. 185.

A critical analysis of St. 1875, c. 185, tends to show that it put upon Boston, so far as that city acted under its provisions, the exercise of a governmental function for the benefit of the general public in the neighborhood of the parks established. Section 16

permits any city or town adjoining Boston after the act shall have been accepted by the voters to elect park commissioners with powers similar to those conferred upon the Boston Park Commissioners and "to lay out and improve parks within such adjoining city or town in conjunction or connection with any park laid out in Boston." The establishment of parks by the adjoining cities and towns under this statute thus was conditioned upon prior action by Boston, and then the other municipalities could lay out parks only "in conjunction or connection" with some park previously laid out by Boston. The plain implication is that, when a joint enterprise of this sort was completed, it was for the general benefit and use of the public, and that municipal boundaries were to be obliterated so far as concerned reasonable enjoyment of the entire park unit, although its territory may have been furnished by two or more cities or towns.

Playgrounds and public shade trees acquired and maintained by cities and towns are closely analogous in their essential features to parks. In *Kerr* v. *Brookline,* 208 Mass. 190, 191, it was said "the town is not the owner of the playground in any ordinary sense. The property is held under the statute, solely for a public use. R. L. c. 28, § 19." In *Donohue* v. *Newburyport,* 211 Mass. 561, the planting, maintenance and care of shade trees by cities and towns was held to be a purely public service without any element of special advantage to the municipality, undertaken distinctly for the public weal, and not for the private emolument of the municipality.

It has been held frequently that cities and towns are not liable for injuries occasioned to people using public parks, *Veale* v. *Boston,* 135 Mass. 187, *Oliver* v. *Worcester,* 102 Mass. 489, *Lincoln* v. *Boston,* 148 Mass. 578, *McKay* v. *Reading,* 184 Mass. 140, nor for the negligent conduct of park commissioners acting within the scope of their authority. *Holleran* v. *Boston,* 176 Mass. 75. *Blair* v. *Granger,* 24 R. I. 17. The ground of these decisions of necessity is that the maintenance of public parks is the function of an agency of government, and not one resting in any degree upon the property rights of the municipality.

In other jurisdictions it has been held that the use of a public park is not confined to citizens of the municipality in which it is located, but is for all people. *Price* v. *Plainfield,* 11 Vroom, 608, 612. *People* v. *Park & Ocean Railroad,* 76 Cal. 156, 161. It has

been decided also in substance that the acquisition, control and management of public parks belongs primarily to the State. Municipalities in this particular act as governmental agencies under an authority delegated by the State, and are always subject to the Legislature. *Hartford* v. *Maslen,* 76 Conn. 599, 611. *In re condemnation of land at Nahant,* 128 Fed. Rep. 185, 186. *In re certain land in Lawrence,* 119 Fed. Rep. 453, 454. *Louisville & Nashville Railroad* v. *Cincinnati,* 76 Ohio St. 481, 497. *Daughters* v. *Riley County,* 81 Kans. 548, 552. *Mayor & City Council of Baltimore* v. *Reitz,* 50 Md. 574, 581. See also *Douglass* v. *Montgomery,* 118 Ala. 599, 610; *Hurd* v. *Harvey County,* 40 Kans. 92, 95; *People* v. *Park & Ocean Railroad,* 76 Cal. 156; *West Chicago Park Commissioners* v. *McMullen,* 134 Ill. 170, 178; *Northport Wesleyan Grove Campmeeting Association* v. *Andrews,* 104 Maine, 342, 350; *David* v. *Portland Water Committee,* 14 Ore. 98, 123; *Russell* v. *Tacoma,* 8 Wash. 156.

Passing from a consideration of the authorities to the underlying principles, which in reason must govern, a park of the nature here in question appears to be for the general public rather than for the municipality in its proprietary capacity. The use of the park is in kind analogous to those confessedly public. It closely resembles roads and bridges. These are open to general public travel without reference to the residence of the traveler. The enjoyment of public parks hardly can be restricted to residents of a particular city or town. They cannot be made a source of revenue as may a system of water works or sewerage or gas, electric light or markets. Their use by those most needing them might be prevented by any pecuniary charge. Historically, the advantages derived from parks never have been treated as proper subjects for private enterprise as have the other functions, which, when assumed by the city or town, have been regarded as private. On the contrary, parks in the proper sense to which the public are regularly admitted have been inseparably connected with a public agency. The pleasure resorts authorized by St. 1906, c. 463, Part III, § 34, for street railway companies and kindred places are different in kind from a public park. Although the establishment of this park was permissive and not compulsory, this distinction is not decisive. It is the character of the use which stamps a given municipal venture as public or proprietary.

*Tindley* v. *Salem,* 137 Mass. 171, 176. Adopting this as the test, the dominant aim in the establishment of public parks appears to be the common good of mankind rather than the special gain or private benefit of a particular city or town. The healthful and civilizing influence of parks in and near congested areas of population is of more than local interest and becomes a concern of the State under modern conditions. It relates not only to public health in its narrow sense, but to broader considerations of exercise, refreshment and enjoyment. We should hesitate to say that the State would be powerless to exert compulsion if a city or town should be found so unmindful of the demands of humanity as to fail to provide itself with adequate public grounds. The municipal spirit which dictates an extensive park system is the same in kind as that which provides fine streets and avenues, beautiful bridges and ample public schools of a high standard of efficiency, all distinctly public in their nature. The end sub-served by these instrumentalities is essentially the same general public good.

There are decisions to the contrary by courts of recognized authority. *Park Commissioners* v. *Common Council of Detroit,* 28 Mich. 228. *State* v. *Schweickardt,* 109 Mo. 496, 512. See *People* v. *Mayor of Chicago,* 51 Ill. 17. But they were made before the absolute necessity of public parks as an accompani-ment of modern urban congestion had become so apparent as it is now and under a constitution and body of statute and case law differing from our own. We are not inclined to follow them.

Therefore, we are of opinion, both on authority and on reason, that the park here in question was taken and paid for by the city of Boston as an agency of government, and not as a private corporation.

This conclusion is reached without shaking in any degree the authority of *Mount Hope Cemetery* v. *Boston,* 158 Mass. 509, but with a full recognition of the soundness of that decision. The reference to parks as among the private property of the city on page 519 of that judgment was an *obiter dictum,* merely by way of illustration, and might be true in many instances of gift, grant, devise, or special dedication. It does not apply to a park acquired as was the Back Bay Fens. It follows that the State has the power to appropriate it to another public use with-

out the consent of the city.   Hence it is not necessary to decide whether the approval of the park commissioners and of the school committee constituted an assent by the municipal corporation.

St. 1875, c. 185, § 3, authorized the taking of the land in fee. In this respect the statute is constitutional and vested an absolute title in the city for the public benefit.   *Dingley* v. *Boston,* 100 Mass. 544.   *Page* v. *O'Toole,* 144 Mass. 303.   *Conklin* v. *Old Colony Railroad,* 154 Mass. 155.   *Titus* v. *Boston,* 161 Mass. 209. *Newton* v. *Perry,* 163 Mass. 319.   *Burnett* v. *Boston,* 173 Mass. 173.   *Manning* v. *Bruce,* 186 Mass. 282.   *Hellen* v. *Medford,* 188 Mass. 42.   *Weeks* v. *Grace,* 194 Mass. 296.   *Boston* v. *Talbot,* 206 Mass. 82, 90.   *Winnisimmet Co.* v. *Grueby,* 209 Mass. 1.   The public purpose for which a city has acquired land in fee by the exercise of eminent domain, may be changed by law and the land devoted to some other public use.   No private right of reversion intervenes.   *Strock* v. *East Orange,* 51 Vroom, 619.   *Seattle Land & Improvement Co.* v. *Seattle,* 37 Wash. 274.   *McNeil* v. *Hicks,* 34 La. Ann. 1090, 1093.   *Brooklyn* v. *Copeland,* 106 N. Y. 496, 501.   *Brooklyn Park Commissioners* v. *Armstrong,* 45 N. Y. 234, 243.   *Malone* v. *Toledo,* 28 Ohio St. 643.   *Eldridge* v. *Binghamton,* 120 N. Y. 309.   *Clark* v. *Providence,* 16 R. I. 337.   The Legislature in making such designation of a new public use represents the public, and its determination is final.   *Prince* v. *Crocker,* 166 Mass. 347.   *Codman* v. *Crocker,* 203 Mass. 146, 150.

It remains to ascertain the will of the legislature as manifested in its statutes.   We are of opinion that the statutes upon which the defendants rely do not show a legislative intent to permit the erection of the kind of building here proposed.   The construction of the projected building three hundred feet long and one hundred and fifty feet wide and more than sixty feet high is wholly inconsistent with the use of the land covered by it and in its immediate vicinity for a park.   Land appropriated to one public use cannot be diverted to another inconsistent public use without plain and explicit legislation to that end.   *Boston Water Power Co.* v. *Boston & Worcester Railroad,* 23 Pick. 360.   *Quincy* v. *Boston,* 148 Mass. 389.   *Old Colony Railroad* v. *Framingham Water Co.* 153 Mass. 561, 563.   *Boston & Albany Railroad* v. *Cambridge,* 166 Mass. 224.   *Eldredge* v. *County Commissioners,* 185 Mass. 186. The policy of the Commonwealth has been to add to the common

law inviolability of parks express prohibition against encroachment by buildings, highways, steam or street railways. R. L. c. 53, §§ 17 and 20; c. 28, § 11. The defendants rely upon St. 1911, c. 540, for the necessary legislative permission. This act allows the "erection of a building for the High School of Commerce within the limits of the Back Bay Fens." The building, which it is proposed to erect, is to be used not only for the High School of Commerce but also for the administrative offices of the school committee and the school house commission of the city of Boston. Twenty-one per cent of the building is to be devoted exclusively to these administrative offices, and only the remainder to the High School of Commerce and for corridors, heating, ventilating and other general needs of the building. Thus it appears that a very substantial part is for uses other than those permitted by St. 1911, c. 540. The defendants urge that this statute should be read in connection with St. 1909, c. 446 (which authorized the construction of a building for both purposes and the taking of land therefor) and the two acts treated as parts of a legislative unit. But this involves too great a stretch of the language used. It would have been simple to employ words in 1911 plainly indicative of an intent to authorize the construction of the building contemplated by the Legislature of 1909. The failure to make unequivocally clear such a purpose strongly points as matter of construction to a legislative intent to permit only the building for the High School of Commerce. The firmly settled and frequently declared policy of the Legislature heretofore has been to preserve public parks free from intrusion of every kind which would interfere in any degree with their complete use for this public end. It cannot be assumed that this policy is to be lightly thrown aside. It might well be that relaxation in favor of a High School of Commerce was thought wise, but that a building to include also the administrative offices of the school committee and the school house commission of a great city, to which many more people would resort and in considerable part for business rather than educational purposes, was deemed inexpedient. The two statutes are more easily susceptible of a construction, which does not bind them together as a single piece of legislation. There does not seem to be justification under all the circumstances for construing them as a unit. The city, there-

fore, has no authority to expend money for the erection upon the
Back Bay Fens of the kind of building proposed, but only for
one to be used exclusively as a High School of Commerce.

The parties have requested a decision of the question whether
the constitutional rights of the owners of property, on which was
assessed a betterment tax for the layout and construction of the
Back Bay Fens, would be invaded by the construction of such a
building as is authorized by St. 1911, c. 540. But it was said in
*Prince* v. *Crocker*, 166 Mass. 347, 362, that such a question was
not in issue on a taxpayers' bill. In justice it cannot be deter-
mined without hearing the parties whose property rights are
claimed to be involved. *Lawrence* v. *Smith*, 201 Mass. 214.

*Injunction to issue.*